RODERICK MCKENZIE      *      NO. 2023-CA-0333

VERSUS      *

     COURT OF APPEAL

CHURCHILL DOWNS      *
LOUISIANA HORSERACING      FOURTH CIRCUIT
COMPANY, LLC D/B/A FAIR      *
GROUNDS RACE COURSE &      STATE OF LOUISIANA
SLOTS AND JSR, LLC      * * * * * * *

<u>CONSOLIDATED WITH:</u>      <u>CONSOLIDATED WITH:</u>

JSR, LLC      NO. 2023-CA-0334

VERSUS

RODERICK MCKENZIE

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2019-04673, DIVISION "L"
Honorable Kern A. Reese, Judge
* * * * * *
**Judge Paula A. Brown**
* * * * * *

(Court composed of Judge Roland L. Belsome, Judge Paula A. Brown, Judge
Tiffany Gautier Chase)

Eulis Simien, Jr.
Caleb E. Brown
Roy L. Bergeron
SIMIEN & SIMIEN
7908 Wrenwood Blvd.
Baton Rouge, LA 70809


COUNSEL FOR PLAINTIFF/APPELLANT


Sean Patrick Mount
Bryce M Addison
Megan P. Demouy
DEUTSCH KERRIGAN, LLP
755 Magazine Street
New Orleans, LA 70130

William S. Vincent, Jr.

W. Jared Vincent
LAW OFFICES OF WILLIAM S. VINCENT, JR.
2018 Prytania Street
New Orleans, LA 70130


COUNSEL FOR DEFENDANTS/APPELLEES


**JUDGMENT AFFIRMED IN PART,**
**VACATED IN PART AND REMANDED;**
**JUDGMENT VACATED**
**DECEMBER 13, 2023**

*PAB*
*RLB*
*TGC*

This is a civil action. Plaintiff/Appellant, Roderick McKenzie ("Mr. McKenzie"), appeals two judgments rendered by the district court on December 22, 2022.[1] In one of these judgments ("*Judgment I*"), the district court granted summary judgment in favor of Defendants/Appellees, Churchill Downs Louisiana Horseracing Company, LLC d/b/a Fair Grounds Race Course & Slots ("Churchill Downs") and JSR, LLC ("JSR")—finding that both defendants were entitled to the statutory immunity conferred by La. R.S. 9:2795.3, Louisiana's Equine Immunity Statute (the "LEIS")[2]—and dismissed all claims against them with prejudice. In the other judgment ("*Judgment II*"), the district court granted JSR's motion for summary judgment for nullity of two default judgments rendered against it for lack of evidence of proper service and for being procedurally defective pursuant to La. R.S. 9:2795.3. For the reasons that follow, we affirm the portion of the December 22, 2022 judgment that granted summary judgment in favor of Churchill Downs;

---

[1] The notice of signing of judgment for both judgments was mailed on December 27, 2022.

[2] Louisiana Revised Statutes 9:2795.3 will be discussed more fully *infra*. The terms "La. R.S. 9:2795.3" and "LEIS" will be used interchangeably throughout this opinion.

1

vacate that portion of the December 22, 2022 judgment that granted summary judgment in favor of JSR pursuant to the Louisiana Equine Immunity Statute, dismissing all claims against it with prejudice; and remand for further proceedings consistent with this opinion. We also vacate, in its entirety, the December 22, 2022 judgment that granted summary judgment in favor of JSR for nullity of judgment for lack of proper service and for being procedurally defective.

**FACTUAL AND PROCEDURAL HISTORY**

In the early morning hours of January 17, 2019, Mr. McKenzie was exercising a horse at a racetrack belonging to Churchill Downs, located in New Orleans, Louisiana. According to his deposition testimony, Mr. McKenzie was engaged in "breezing" the horse he was exercising, a process whereby the horse is run at a full sprint in order to prepare for a race. While breezing the horse, a riderless horse suddenly appeared directly in Mr. McKenzie's path heading from the opposite direction at a high rate of speed. Mr. McKenzie testified that prior to the collision he estimated the distance between his horse and the point where the other rider dismounted the now riderless horse to be about one sixteenth ($^{1}/_{16}$) of a mile apart and projected that each horse was travelling at approximately forty miles per hour (40 mph). Unable to evade the oncoming horse, Mr. McKenzie and the horse he was exercising collided head on with the riderless horse, instantly killing one of the horses and injuring the other so badly that it was eventually euthanized. Mr. McKenzie suffered multiple broken bones in his arm, leg and

2

ankle, suffered a torn ACL[3] in his knee and had the radial artery severed in one arm, which caused paralysis in that arm for a period of about six (6) months.

Mr. McKenzie filed a petition for damages on May 3, 2019, in which he named two defendants—JSR[4] and Churchill Downs. In his petition, Mr. McKenzie alleged, *inter alia*, that the rider for JSR jumped off the horse that collided with Mr. McKenzie, the rider was negligent by failing to maintain control of the horse and that JSR was vicariously liable for the actions of its rider.[5] Mr. McKenzie further alleged that Churchill Downs failed to provide a proper warning system and failed to adequately ensure riders that operated on its track were properly trained and/or equipped to prevent collisions such as the one in which he was involved.

For the sake of continuity and clarity, we will separately outline the procedural histories and judgments rendered in favor of JSR and Churchill Downs, respectively.

### JSR's history

After Mr. McKenzie's petition for damages was filed, the sheriff's office was unable to effectuate service on JSR; as such, on August 11, 2019, Mr. McKenzie filed a motion with the district court to appoint a private process server on August 14, 2019. On February 3, 2020, Mr. McKenzie filed a notice of service by private process server, along with the sworn affidavit of Mark Baker, the private

---

[3] Anterior cruciate ligament.

[4] JSR was the entity hired to exercise the horse that collided with Mr. McKenzie.

[5] In his first amending and supplemental petition, Mr. McKenzie added the allegation that after JSR's rider jumped off, the rider intentionally struck the horse.

process server. In the affidavit, Mr. Baker attested that service was effectuated on JSR via personal service on Joe Sharp[6] on October 27, 2019. On March 9, 2020, Mr. McKenzie filed a motion for preliminary default judgment against JSR on the grounds that JSR had failed to timely answer his petition as required by La. C.C.P. art. 1001.[7] The district court granted the preliminary default judgment against JSR on March 12, 2020.

A hearing was held on June 25, 2020, wherein Mr. McKenzie sought to confirm the default judgment against JSR solely on the issue of liability. After the confirmation hearing, the district court granted the default on the issue of liability and issued a written judgment confirming the default judgment on the same day. Following, on July 30, 2020, a second confirmation hearing was held on the issue of damages. The next day, on July 31, 2020, the district court signed an order casting JSR in judgment for seven hundred twenty-six thousand, seven hundred thirty-three and $^{71}/_{100}$ dollars ($726,733.71) plus interest and costs. The notice of signing of judgment was mailed on September 18, 2020. One month later, on November 18, 2020, Mr. McKenzie filed a judgment debtor examination rule as the judgment creditor of JSR, which the district court set for hearing on January 21, 2021.

---

[6] JSR's sole member and agent for service of process is Joe Sharp.

[7] Louisiana Code of Civil Procedure article 1001 provides, in pertinent part:

> A defendant shall file his answer within twenty-one days after service of citation upon him, except as otherwise provided by law. If the plaintiff files and serves a discovery request with his petition, the defendant shall file his answer to the petition within thirty days after service of citation and service of discovery request.

In a separate action ("nullity action"), JSR filed a petition for nullity of judgment ("nullity petition") on January 4, 2021, alleging that the two default judgments rendered against it were absolute nullities due to a lack of service of process, as codified under La. C.C.P. art. 2002.[8]  Louisiana Code of Civil Procedure article 2002 decrees, in relevant part:

A. A final judgment shall be annulled if it is rendered:

*  *  *

(2) Against a defendant who has not been served with process as required by law and who has not waived objection to jurisdiction, or against whom a valid default judgment has not been taken.

In support, JSR attached the affidavit of Joe Sharp who attested that he had not been personally served with the nullity petition and that at the time of the purported service he was in a location nearly thirty (30) miles away from where the process server's affidavit stated that service was effected.

A few months later, on June 14, 2021, this nullity action was transferred and consolidated with the other pending litigation arising from Mr. McKenzie's petition for damages.[9]  On March 4, 2022, JSR filed a motion for summary judgment, again requesting that the June 25 and July 31, 2020 default judgments be declared null and void for lack of service.  The motion for summary judgment came for hearing on July 22, 2022, and was subsequently denied by the district court in a judgment rendered on August 10, 2022.[10]  However, on October 17,

---

[8] JSR's petition for nullity, filed in Civil District Court for Orleans Parish under docket no. 2021-0043, Div. "L", was transferred and consolidated with Mr. McKenzie's petition for damages filed under docket no. 2019-4673, Div. "L".

[9] Our review of the record does not find that JSR's nullity petition was ever ruled upon.

[10] The record does not reflect that JSR took any further action on this adverse judgment.

2022, Mr. McKenzie and JSR filed a joint stipulation and a consent order with the district court, annulling the June 25 and July 31, 2020 default judgments.[11]

***Churchill Downs' history***

On August 7, 2019, Churchill Downs filed its answer to Mr. McKenzie's petition for damages. Contained within the answer were several affirmative defenses asserted by Churchill Downs, including that of the statutory immunity provided for via La. R.S. 9:2795.3. Generally speaking, the LEIS provides immunity for certain actors engaged in particular activities involving horses— "equine activity"—with certain enumerated exceptions, which if proven to apply, would remove the shield from liability provided by the statute. Specifically, La. R.S. 9:2795.3(B) provides, in pertinent part, that "[e]xcept as provided in Subsection C of this Section, an equine activity sponsor . . . shall not be liable for an injury to or the death of a participant resulting from the inherent risks of equine activities . . . ."[12]

After a prolonged discovery period, Churchill Downs filed a motion for summary judgment on March 15, 2021.[13] In its motion, Churchill Downs argued that: (1) the facts of this case triggered the application of the LEIS; (2) Mr. McKenzie failed to provide evidence that any of the enumerated exceptions to immunity found in the statute were applicable; and (3) Mr. McKenzie would be

---

[11] The private process server, Mark Baker, passed away at some point prior to the execution of the joint stipulation and was therefore unavailable to provide any testimony or evidence to confirm the accuracy of his affidavit of service.

[12] The definitions and exceptions outlined in the LEIS will be more fully discussed *infra*.

[13] By way of context, we note that on March 11, 2020, Governor John Bel Edwards declared a state of public health emergency due to the potential for the rapid spread of COVID-19 throughout the State. This emergency declaration was renewed on a monthly basis until it was allowed to expire on March 16, 2022.

unable to meet his burden of proof at trial because no genuine issue of material fact as to Churchill Downs' liability existed.

On March 18, 2022, the district court conducted a hearing on Churchill Downs' motion for summary judgment. After taking the matter under advisement, on December 22, 2022, the district court signed two discrete judgments—*Judgment I and Judgment II*. In *Judgment I*, the district court granted summary judgment in favor of Churchill Downs and JSR, finding that both were entitled to the statutory immunity conferred by La. R.S. 9:2795.3 and dismissed all claims against them with prejudice; and in *Judgment II*, the district court granted JSR's motion for summary judgment for nullity of judgment for lack of evidence of proper service and found that the default judgments against Mr. McKenzie were procedurally defective pursuant to La. R.S. 9:2795.3. This timely appeal follows.

## STANDARD OF REVIEW

"It is well-settled law that '[t]his Court reviews the granting of '[a] summary judgment on appeal *de novo*, using the same criteria that govern the [district] court's determination of whether summary judgment is appropriate.'" *Sebble on Behalf of Est. of Brown v. St. Luke's #2, LLC*, 22-0620, p. 4 (La. App. 4 Cir. 3/6/23), 358 So.3d 1030, 1034 (quoting *Johnson v. Palazzo*, 22-0502, p. 3 (La. App. 4 Cir. 12/7/22), 353 So.3d 1022, 1023). "The burden of proof rests with the mover." La. C.C.P. art. 966(D)(1). "Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but

7

rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense." *Id.* "The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law." *Id.*

## DISCUSSION

Mr. McKenzie asserts six assignments of error, which interchangeably raise issues with both *Judgment I* and *Judgment II* in favor of JSR, and *Judgment I* in favor of Churchill Downs. For ease of discussion, will address the assigned errors raised against JSR and Churchill Downs separately and out of turn.

### *Judgments in favor of JSR*

In his first assignment of error, Mr. McKenzie contends that the district court erred by granting summary judgment in favor of JSR when JSR did not file a motion for summary judgment. In his sixth assignment of error, Mr. McKenzie posits that even if JSR had filed a motion, the district court erred in granting summary judgment in its favor because genuine issues of fact exist as to whether the injuries sustained by Mr. McKenzie were inherent risks of equine activities. Mr. McKenzie insists that, even if they were inherent risks, there exist genuine issues of fact as to whether JSR's conduct was a willful and wanton disregard for the safety of the other participants.

As we recounted in JSR's history, on March 4, 2022, JSR filed a motion for summary judgment to annul the two default judgments rendered against it, which

8

was then denied by the district court. Following, JSR entered into a consent judgment with Mr. McKenzie on October 17, 2022, in which the parties agreed that the default judgments were annulled. Our review of the record reveals that JSR filed an answer to Mr. McKenzie's petition on November 14, 2022, and that this was the only pleading filed by JSR after filing the consent judgment and prior to the district court signing *Judgment I* and *Judgment II* on December 22, 2022.

*Judgment I* declares, in pertinent part:

> This matter came for hearing on the 18th day of March, 2022 on Churchill Downs Louisiana Horseracing Company, LLC d/b/a Fair Grounds Race Course & Slots and JSR, LLC's Motion for Summary Judgment . . . .
>
> **PRESENT: Eustis Simien, Jr. (LSBA No. 12077), Counsel for Roderick McKenzie**
>
> **PRESENT: Sean P. Mount (LSBA No. 27584), Counsel for Churchill Downs Louisiana Horseracing Company, LLC d/b/a Fair Grounds Race Course & Slots and JSR, LLC**
>
> \* \* \*
>
> **IT IS ORDERED, ADJUDGED, AND DECREED** that Churchill Downs Louisiana Horseracing Company, LLC d/b/a Fair Grounds Race Course & Slots and JSR, LLC's Motion for Summary Judgment for lack of genuine issues of material fact is **GRANTED** . . . .
> **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Plaintiff Roderick McKenzie's Petition for Damages against Defendants Churchill Downs Louisiana Horseracing Company, LLC d/b/a Fair Grounds Race Course & Slots and JSR, LLC is **DISMISSED WITH PREJUDICE**.

We find this judgment to be problematic for two reasons. First, the judgment sets forth that attorney Sean Mount was present at the motion hearing on behalf of both Churchill Downs and JSR; however, in the March 18, 2022 hearing transcript, Mr. Mount clearly states that he was making an appearance on behalf of Churchill

9

Downs and makes no mention of JSR. Further, our review of the record indicates that throughout the district court proceedings William S. Vincent was JSR's attorney of record, and that neither he nor JSR made an appearance at the March 18, 2022 hearing.

Second, as previously discussed, the record reflects that JSR had no pending motions before the district court at the time of the March 18, 2022 hearing.[14] Louisiana Code of Civil Procedure article 966(F) provides that "[a] summary judgment may be rendered or affirmed only as to those issues set forth in the motion under consideration by the court at that time." Accordingly, we find the district court erred when it granted summary judgment in favor of JSR in *Judgment I* when there was no such motion under consideration at that time.

*Judgment II* is equally problematic. Although the judgment references a July 1, 2022 hearing, it is clear from the record that the hearing on JSR's motion for summary judgment for nullity for lack of proper service and for being procedurally defective was actually held on July 22, 2022.[15] Thus, this motion had already been adjudicated by the district court when it denied JSR's motion for summary judgment in its August 10, 2022 judgment. Moreover, when JSR entered into the October 17, 2022 consent judgment with Mr. McKenzie, which stipulated that the June 25, 2020 and July 31, 2020 default judgments against JSR were null and void, the matter was disposed of entirely. For the same reason we cited in relation to *Judgment I*—that there was no motion by JSR under consideration by

---

[14] Counsel for JSR conceded at oral argument before this Court that JSR had not filed a motion for summary judgment.

[15] JSR's July 18, 2022 expedited motion to strike explains that the summary judgment hearing was originally scheduled for July 1, 2022, but due to the unavailability of the presiding judge, the hearing was continued until July 22, 2022.

the district court—the district court committed legal error when it *sua sponte* rendered *Judgment II* in favor of JSR. This argument has merit.

Having found the district court erred in granting summary judgment in favor of JSR, we find it unnecessary to address Mr. McKenzie's sixth assignment of error.

### *Judgment in favor of Churchill Downs*

Mr. McKenzie asserts four assigned errors (Assignments of Error Numbers Two, Three, Four and Five) in *Judgment I* regarding Churchill Downs, which involves the application of the LEIS. In essence, Mr. McKenzie argues that the district court erred in granting summary judgment in favor of Churchill Downs because there exist genuine issues of fact as to whether:

(1) Mr. McKenzie's injuries resulted from inherent risks of equine activities;

(2) Churchill Downs made reasonable and prudent efforts to determine the ability of the participants to engage safely in equine activity; and

(3) Churchill Downs acted in willful and wanton disregard for the safety of participants by failing to ensure it had an adequate warning system in place and failed to warn participants of this shortcoming.

We will address each of Mr. McKenzie's arguments in turn. However, before addressing the merits of Mr. McKenzie's claims, we will first review the relevant portions of the LEIS.

Louisiana Revised Statutes 9:2795.3 provides the definitions pertinent to our review:

A. As used in this Section, the following terms shall have the following meanings, unless the context requires otherwise:

(1) "Engages in an equine activity" means riding, training, racing, driving, providing farrier services, providing or assisting in providing medical treatment of, or being a passenger upon an equine, whether

mounted or unmounted, or any person assisting a participant or show management. The term "engages in an equine activity" does not include being a spectator at an equine activity, except in cases where the spectator places himself in an unauthorized area and in immediate proximity to the equine activity.

(2) "Equine" means a horse, pony, mule, donkey, or hinny.

(3) "Equine activity" includes any or all of the following:

\* \* \*

(b) Equine training or teaching activities, or both.

\* \* \*

(4) "Equine activity sponsor" means an individual, group, club, partnership, corporation, or other entity, whether or not the sponsor is operating for profit or nonprofit, which sponsors, organizes, or provides the facilities for an equine activity, including but not limited to a pony club; 4-H club; hunt club; riding club; licensed racetrack; licensed training centers . . . .

\* \* \*

(6) "Inherent risks of equine activities" means those dangers or conditions which are an integral part of equine activities, including but not limited to:

(a) The propensity of an equine to behave in ways that may result in injury, harm, or death to persons on or around them.

(b) The unpredictability of an equine's reaction to such things as sounds, sudden movement, and unfamiliar objects, persons, or other animals.

\* \* \*

(d) Collisions with other equine or objects.

(e) The potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, such as failing to maintain control over the animal or not acting within his ability.

(7) "Participant" means any person, whether amateur or professional, who engages in an equine activity, whether or not a fee is paid to participate in the equine activity, and any equine stabled, training, or running on the racetrack or at a licensed training center and any

12

jockey, exercise person, trainer, owner or employee, agent, or independent contractor of each.

Louisiana Revised Statutes 9:2795.3(B) and (C) provide that:

* * *

B. Except as provided in Subsection C of this Section, an equine activity sponsor, an equine professional, or any other person, which shall include a corporation or partnership, shall not be liable for an injury to or the death of a participant resulting from the inherent risks of equine activities and, except as provided in Subsection C of this Section, no participant or participant's representative shall make any claim against, maintain an action against, or recover from an equine activity sponsor, an equine professional, or any other person for injury, loss, damage, or death of the participant resulting from any of the inherent risks of equine activities.

C. Nothing in Subsection B of this Section shall prevent or limit the liability of an equine activity sponsor, an equine professional, or any other person if the equine activity sponsor, equine professional, or person either:

(1) Provided the equipment or tack, and knew or should have known that the equipment or tack was faulty, and such equipment or tack was faulty to the extent that it did cause the injury.

(2) Failed to make reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity and to safely manage the particular equine based on the participant's representations of his ability.

(3) Owned, leased, rented, or otherwise was in lawful possession and control of the land or facility upon which the participant sustained injuries because of a dangerous latent condition which was known or should have been known to the equine activity sponsor, equine activity sponsor, equine professional, or person and for which warning signs have not been conspicuously posted.

(4) Committed an act or omission that constitutes willful or wanton disregard for the safety of the participant, and that act or omission caused the injury.

(5) Intentionally injured the participant.

Now we turn to Mr. McKenzie's assigned errors.

First, Mr. McKenzie argues that summary judgment is inappropriate because Churchill Downs has failed to provide any proof to support a finding that this particular collision was an inherent risk of equine activities; thus, Churchill Downs is not entitled to the statutory immunity afforded by the LEIS.

At the outset we note that there is no dispute amongst the parties as to Churchill Downs' status as an equine activity sponsor or the statuses of Mr. McKenzie or JSR's rider as participants as defined by the LEIS. Neither is there any dispute that in the case *sub judice* the participants were engaged in equine activity at the time of the collision. Nonetheless, Mr. McKenzie posits that under the facts presented in this case, Churchill Downs had the burden of proof to demonstrate that the collision that occurred between the two horses is the same type of collision that is the same type of collision provided for in La. R.S. 9:2795.3(A)(6)(d); and it failed to do so.

In support of his contention, Mr. McKenzie points out that this Court has previously held that "'[s]tatutes . . . that grant immunities or advantages to special classes in derogation of the general rights available to tort victims, must be strictly construed against the party claiming the immunity or advantage.'" *Larson v. XYZ Ins. Co.*, 15-0704, p. 9 (La. App. 4 Cir. 3/23/16), 192 So.3d 181, 187 (quoting *Medine v. Geico Gen. Ins. Co.*, 97-2393, p. 4 (La. App. 4 Cir. 11/17/99), 748 So.2d 532, 535). Further, Mr. McKenzie cites *Touro Infirmary v. Marine Med. Unit, Inc.*, wherein this Court noted that "[t]he party pleading an affirmative defense bears the burden of proving such a defense, and the defense must be established by a preponderance of the evidence." 96-2506, p. 7, n.3 (La. App. 4 Cir. 5/21/97), 699 So.2d 90, 93 (citing *Crescent Cigarette Vending Corp. v. Toca*, 271 So.2d 53 (La. App. 4th Cir.1972)). However, we find Mr. McKenzie's reliance upon *Touro*

14

is misplaced and that the facts presented to us in that case are inapposite to the instant matter.

In *Touro*, the defendant sought to assert the affirmative defense of payment on an open account, but failed to provide any evidence of that payment. As such, this Court found that he failed to meet his burden of proof. Similarly, the line of cases that have since relied upon our decision in *Touro* to establish a defendant's burden of proof by the preponderance of the evidence are all distinguishable. *See, e.g., Brown v. Martin*, 10-0799 (La. App. 4 Cir. 12/8/10), 53 So.3d 643 (where the affirmative defense of self-defense was pled when the defendant, an off-duty deputy, shot and wounded the plaintiff); *235 Holdings, LLC v. 235 Enters., LLC*, 20-0658 (La. App. 4 Cir. 12/15/21), 334 So.3d 862 (addressing an improperly pled affirmative defense in an eviction proceeding where defendant was trying to maintain possession of commercial property space). On the contrary, we find the factual scenario presented to us in *Larson* to be much more instructive in the case *sub judice*.

The *Larson* Court was tasked with determining whether the LEIS provided immunity to a horse stable owner when the plaintiff entered a stable at a time when the office was closed, and attempted to feed treats to a horse, but instead had her finger bitten off by the horse. Strictly construing the LEIS, the *Larson* Court deduced that the plaintiff did not qualify as a participant because the activity of feeding treats to a horse was not expressly provided for as an equine activity under the statute. Ultimately, we remanded the case to the district court finding that factual issues still remained as to whether the plaintiff had permission to be on the premises, whether the plaintiff qualified as a spectator as provided for in the

15

LEIS,[16] and whether the stable had posted the requisite signage mandated in La. R.S. 9:2795.3(E) and (F).[17]

The factors confronting the *Larson* Court do not exist here. As we previously noted, none of the parties dispute that Churchill Downs or the riders fit within the LEIS definitions of an equine activity sponsor or participants or that the riders were engaged in an equine activity at the time of the collision. Mr. McKenzie urges us, however, to conclude that questions remain as to whether any of the elements of inherent risks of equine activity apply when a rider intentionally dismounts and strikes a horse. Churchill Downs contends that Mr. McKenzie is relying on inadmissible hearsay in order to support his assertion that JSR's rider committed an intentional act—dismounting and striking the horse he was riding—resulting in Mr. McKenzie's injuries. We agree.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of

---

[16] *See* La. R.S. 9:2795.3(A)(1) *supra*.

[17] Louisiana Revised Statutes 9:2795.3(E) and (F), which are not at issue in this case, provide:

> E. Every equine professional and every equine activity sponsor shall post and maintain signs which contain the warning notice specified in Subsection F of this Section. Such signs shall be placed in a clearly visible location on or near any stable, corral, or arena where the equine professional or the equine activity sponsor conducts equine activities. The warning notice specified in Subsection F of this Section shall appear on each sign in black letters, with each letter to be a minimum of one inch in height. Every written contract entered into by an equine professional or by an equine activity sponsor for the providing of professional services, instruction, or the rental of equipment or tack or an equine to a participant, whether or not the contract involves equine activities on or off the location or site of the equine professional's or the equine activity sponsor's business, shall contain in clearly readable print the warning notice specified in Subsection F of this Section
> .
> F. The signs and contracts described in Subsection E of this Section shall contain the following warning notice:
> **WARNING**
> Under Louisiana law, an equine activity sponsor or equine professional is not liable for an injury to or the death of a participant in equine activities resulting from the inherent risks of equine activities, pursuant to R.S. 9:2795.3.

the matter asserted." La. C.E. art. 801(C). Generally, hearsay is not admissible unless it meets one of the enumerated statutory exceptions. *See* La. C.E. arts. 802 *et seq*. In this instance, the only evidence offered in the record to prove that JSR's rider dismounted and struck the horse he was riding is contained within the deposition testimony of Mr. McKenzie. In it, Mr. McKenzie testified that he did not actually see the other rider dismount or strike the horse, rather, this version of events was related to him by his friend, Nathaniel. Further, Mr. McKenzie did not provide any kind of incident report, witness statements or affidavits to support this allegation. In fact, Mr. McKenzie was unable to say with certainty which direction the other horse was heading prior to the collision or at what gait it was moving.

This Court has previously held that deposition testimony provided by a plaintiff, in which it is evident that the plaintiff has no first-hand knowledge of the events leading to their injuries, without further support that deposition testimony is inadmissible hearsay. *See Jackson v. Bally's Louisiana, Inc.*, 09-1574, pp. 4-5 (La. App. 4 Cir. 4/7/10), 36 So.3d 1001, 1004 (wherein the plaintiff's deposition was deemed inadmissible hearsay when she testified that a casino employee knocked her down and admitted it, but offered no other proof than her own statement, and couldn't explain how the collision occurred); *see also Jones v. Boot Bar & Grill*, 22-0154, pp. 26-27 (La. App. 4 Cir. 10/5/22), 350 So.3d 968, 986 (where this Court determined that deposition testimony from the plaintiff alleging employment status for purposes of vicarious liability of the defendant was inadmissible hearsay because the plaintiff's knowledge was based upon what he was told by someone on the scene). Accordingly, we find that Mr. McKenzie's deposition testimony regarding whether the riderless horse was intentionally struck prior to the collision

17

is inadmissible hearsay.[18]  Therefore, there exists no issue of fact as to whether the collision at issue here was the result of an inherent risk of equine activity.

Furthermore, we cannot agree with Mr. McKenzie's assertion as it relates to Churchill Downs' burden of proof.  Mr. McKenzie would have us interpret prior jurisprudence to find that the onus lies with Churchill Downs to dispositively prove that none of the exceptions to statutory immunity provided for in the LEIS are pertinent.  On the contrary, we read Subsection B of the LEIS to shift the burden to the plaintiff.  As mandated by the plain language of the statute, an injured participant engaged in equine activity is expressly prohibited from asserting or maintaining a claim against an equine activity sponsor unless the plaintiff provides evidence that the equine activity sponsor's acts or omissions fall within one of the enumerated exceptions provided for in Subsection C.[19]  In other words, we find that once a *prima facie* case has been made that the status of the actors and their activities fall within the statutory definitions outlined in the LEIS, the statute is immediately triggered to provide immunity for the litigant asserting this affirmative defense.[20]

This methodology is entirely in keeping with this Court's previous approach when faced with determining the applicability of statutory immunity and exceptions to that immunity.  *See Fin & Feather, LLC v. Plaquemines Par. Gov't,*

---

[18] Mr. McKenzie speculated in his deposition that the horse would have taken off whether or not it had been struck, due to all of the movement of the other horses on the track at that time.

[19] As noted *supra*, failure to provide proper signage and contractual language warning of the inherent risks of equine activity are disqualifiers for statutory immunity, but neither are at issue here.  See *supra* note 12.

[20] Churchill Downs properly pled the affirmative defense of statutory immunity in an answer to Mr. McKenzie's petition, as required by La. C.C.P. art. 1005: "The answer shall set forth affirmatively negligence, or fault of the plaintiff and others, duress, error or mistake, estoppel, extinguishment of the obligation in any manner, failure of consideration, fraud, illegality, injury by fellow servant, and any other matter constituting an affirmative defense."

16-0256, p. 10 (La. App. 4 Cir. 9/28/16), 202 So.3d 1028, 1035 (where this Court explained that when a defendant moves for summary judgment and has asserted an affirmative defense, once the defendant demonstrates that statutory immunity applies and that an absence of factual support exists as to any exceptions, the burden then shifts to the plaintiffs "to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial." La. C.C.P. art. 966(C)(2)); *see also Citron v. Gentilly Carnival Club, Inc.*, 14-1096, pp. 14-15 (La. App. 4 Cir. 4/15/15), 165 So.3d 304, 314 (wherein this Court found that once the defendant established that an immunity statute applied for purposes of summary judgment, the burden shifted to the plaintiffs, as the non-movants, to establish the existence of a genuine issue of material fact concerning the applicability of an exception). This argument is without merit.

Second, citing to the exception found in La. R.S. 9:2795.3(C)(2), Mr. McKenzie asserts that Churchill Downs "[f]ailed to make reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity and to safely manage the particular equine based on the participant's representations of his ability." However, our review of the record finds that Mr. McKenzie neglected to provide any documentary evidence that Churchill Downs' procedures for ascertaining the ability of participants were somehow unreasonable or that any of the participants at Churchill Downs lacked the requisite ability to engage safely.[21] Mr. McKenzie further alleges that Churchill Downs allowed riders who had committed safety violations on their track to continue to participate

---

[21] In the deposition of Jason Boulet, Churchill Downs' director of operations, Mr. Boulet testified that Churchill Downs relied on the fact that a participant held a valid license from the Louisiana Racing Commission to be determinative that a participant possessed the requisite ability. Mr. McKenzie argues that this reliance is unreasonable, but provides no further documentary evidence to support this contention.

19

in equine activities, but offers nothing in the way of proof. This argument is without merit.

Finally, Mr. McKenzie maintains that Churchill Downs' conduct is violative of La. R.S. 9:2795.3(C)(4), alleging that its acts and omissions rise to the level of willful and wanton when it failed to provide an adequate warning system and then failed to timely activate the warning system that was in place at the time of the collision. To bolster this assertion, Mr. McKenzie attached portions of the 2018 Code of Standards formulated by the National Thoroughbred Racing Association Safety and Integrity Alliance ("NTRA") to his opposition to Churchill Downs' motion for summary judgment.[22] Mr. McKenzie contends that per the NTRA Code all racing and training tracks should be equipped with an emergency warning system consisting of both lights and sirens. Churchill Downs' Director of Operations, Jason Boulet, testified in his deposition that on the day of the collision, Churchill Downs had a warning system in place that consisted of a P.A. system. He further testified that membership in or accreditation by the NTRA was not mandatory for Churchill Downs to legally operate. Similarly, our research of the applicable statutes does not find that this type of warning system is codified into Louisiana law. Moreover, Mr. McKenzie has provided no evidence that the NTRA's standard, or any other standard, is binding on the Churchill Downs track located in New Orleans, Louisiana.[23]

---

[22] Mr. McKenzie submitted an affidavit to verify that this document is what it purports to be. However, whether his attestation is sufficient to authenticate this document is immaterial to our determination.

[23] Mr. McKenzie also argued that the lighting was insufficient or defective at the area of the track where the collision occurred; however, he has presented no evidence to show that it was malfunctioning on the day of the collision or that it contributed to the collision in any way.

Mr. McKenzie further argues that had Churchill Downs timely warned him, he would have been able to take evasive actions to attempt to avoid the collision. We disagree. Mr. McKenzie testified in his deposition that at the time that JSR's rider dismounted the horse, the two horses were approximately one sixteenth ($^1/_{16}$) of a mile apart and that each horse was travelling nearly forty miles per hour (40 mph) at the time of the collision. Furthermore, the record indicates that in order for the warning system to be triggered, it was dependent upon human reaction time.[24] Therefore, we conclude that according to the evidence and timeline provided by Mr. McKenzie, there is nothing contained within the record to raise a genuine issue that his injuries were not the direct result of an inherent risk of equine activity. This argument is without merit.

## CONCLUSION

For the foregoing reasons, we affirm the portion of the December 22, 2022 judgment that granted summary judgment in favor of Churchill Downs; vacate that portion of the December 22, 2022 judgment that granted summary judgment in favor of JSR pursuant to the Louisiana Equine Immunity Statute, dismissing all claims against it with prejudice; and remand for further proceedings consistent with this opinion. We also vacate, in its entirety, the December 22, 2022 judgment

---

[24] Mr. Boulet's deposition described the warning system in effect in New Orleans at the time of the collision as consisting of "outriders" positioned along portions of the track, equipped with radios. In order to trigger an alert, the outriders would radio in to "clockers" who would then make an announcement over the P.A. system. The Churchill Downs committee meeting notes attached to Mr. McKenzie's opposition indicate that Churchill Downs was hoping to implement a system whereby the outriders would have transmitters that would directly trigger the warning system. Nevertheless, either system is reliant upon human reaction time; Mr. McKenzie's testimony reflects that from the time the other horse became riderless to the collision was only a matter of seconds.

that granted summary judgment in favor of JSR for nullity of judgment for lack of proper service and for being procedurally defective.

**JUDGMENT AFFIRMED IN PART, VACATED IN PART AND REMANDED; JUDGMENT VACATED**